**UNITED STATES of America**

v.

**MAIN STREET DISTRIBUTING INC., d/b/a "Main Street Distributors", Stephen Pesce, Mark Benowitz, Arthur Eisenman, Robert Cavaliere, and Stuart Podolsky, Defendants.**

**No. CR 88–261(RR).**

United States District Court,
E.D. New York.

Nov. 23, 1988.

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Brooklyn, N.Y. by Thomas P. Milton, Asst. U.S. Atty., for plaintiff.

Gerald B. Lefcourt, P.C., New York City by Gerald B. Lefcourt, Richard W. Levitt, for defendant Stephen Pesce.

## MEMORANDUM and ORDER

RAGGI, District Judge:

Defendant Stephen Pesce was initially charged in a one-count indictment with having knowingly and willfully offered for sale in interstate commerce various articles of drug paraphernalia, specifically, five hundred vials with small spoons attached, primarily intended and designed for use in inhaling, ingesting and otherwise introducing cocaine into the body, in violation of 21 U.S.C. § 857, the Mail Order Drug Paraphernalia Act.[1] He has since been named, together with his business, Main Street Distributing Inc. (hereinafter "Main Street Distributors"), and four individuals, Mark Benowitz, Arthur Eisenman, Robert Cavali-

---

1. This statute, which was enacted on October 27, 1986, and went into effect on January 25, 1987, is reproduced as Appendix A to this Memorandum and Order.

ere and Stuart Podolsky, in a twenty-five count indictment charging further violations of § 857, specifically: (1) the unlawful importation of drug paraphernalia, including 84,000 pocket scales, 12,000 strainers, fine gauge metal mesh, and 20,000,000 polyethylene bags; (2) the unlawful exportation of drug paraphernalia, including, *inter alia*, cocaine test kits, cocaine use kits, and butane torches; (3) the unlawful offering of drug paraphernalia for sale and transportation in interstate commerce, including, *inter alia*, cocaine use kits, cocaine inhalers, cocaine vials, crack pipes, roach clips, metal mesh screens, and such common narcotic diluents as inositol and mannitol; and (4) the unlawful use of the United Parcel Service as part of a scheme to sell drug paraphernalia.

The items referred to in the two indictments were seized pursuant to warrants executed by United States Customs Agents on March 3, and 31, 1988, at the Hauppauge, Long Island Office of Main Street Distributors.

Subsequent to the filing of the first indictment, Pesce moved to suppress evidence obtained during these two searches on the grounds: (1) that the warrant permitting the first search was unsupported by probable cause; and (2) that the probable cause supporting the second warrant was the illegal fruit of the first search. He further moved to dismiss the first indictment on the grounds that the Mail Order Drug Paraphernalia Act is unconstitutional. Presumably, his arguments pertain equally to the superseding charges.

The court denies both motions.

## I. *Factual Background*

### A. *The March 2, 1988 Warrant*

On March 2, 1988, Chief Magistrate A. Simon Chrein signed a warrant authorizing federal agents to search Main Street Distributors for:

> Evidence of shipments of glass tubes imported by Freedom Imports, Inc., ...;
> Evidence of the final disposition, sale, transfer and distribution of the glass tubes and 1½ inch by 1¾ inch polyethyl-

ene bags that Freedom Imports either imported or trafficked in ...;

> Drug paraphernalia including glass tubes with or without screens, and 1½ inch by 1¾ inch polyethylene bags.
> .1 millimeter (sic) stainless steel mesh screens and ¾ inch by 2 inch polyethylene bags.

In support of the warrant, the United States had submitted to Magistrate Chrein the affidavit of Customs Special Agent Anthony Giattino. The affidavit also supported applications for warrants to search three other locations: Freedom Imports, Inc., located in New York, New York; Funky Enterprises, located in Richmond, New York; and Berndie, Inc., d/b/a Dee's Headway, located in Newark, New Jersey.

Agent Giattino relayed his own or fellow agents' observations of the exterior physical layout of each of the businesses in question, stating, in conclusory fashion, that each "is in the wholesale drug paraphernalia business."

More particularly, the agent noted that Customs records showed that on July 7, 1987, Freedom Imports had imported into the United States from Taiwan 200,000 4-inch glass tubes, described on Customs documents as "stirrers." Relying on the expertise of agents in the Intelligence Division of the Drug Enforcement Administration, Agent Giattino reported that 4-inch glass tubes are the basic element of pipes used to smoke the cocaine derivative "crack." Only heat sink screens need be inserted in the glass pipes for street use.

Customs records further indicated that on December 30, 1987, Freedom Imports had imported another 500,000 4-inch glass tubes, which tubes were seized as possible drug paraphernalia.

In February, 1988, a Customs agent successfully obtained, over the telephone, from Freedom Imports price quotations for "stems," the common expression for glass crack pipes, and the screens to be used in them. When, however, an agent went in person to Freedom Imports, he was told that three references were necessary before he could purchase any stems or screens.

Customs had obtained, and Agent Giattino attached to his affidavit, a letter dated February 3, 1988 from Pesce to Freedom Imports confirming Main Street Distributors' purchase of an unspecified number of 4-inch glass tubes and its knowledge that the items were imported from Taiwan. Customs records further demonstrated that on December 10, 1987, Main Street Distributors had imported into the United States from Japan .1 millimeter gauge stainless steel mesh screens. Customs records also showed that on September 20, 1987, Main Street had imported from Taiwan 500,-000 ¾ inch by 2 inch polyethylene bags and, on October 18, 1987, imported 15 million such bags. Agent Giattino reported that, in his experience, which for the last two and one-half years had focused on import violations, such bags were used to store small quantities of heroin.

## B. The March 3, 1988 Search

The first warrant for the search of Main Street Distributors was executed on March 3, 1988. In the course thereof, agents seized approximately 38 boxes of metal mesh screens together with two rolls of metal mesh, 175 boxes of ¾ inch by 2 inch polyethylene bags, and various sales invoices and computer diskettes. Apparently, no glass tubes were seized.

The sales records, which reflected annual gross sales by Main Street of $3.7 million, included invoices for items such as "QHS w/vial," and "QHL w/vial," which Agent Giattino knew, based on his experience, to refer to a "quick hit—small, with vial," or a "quick hit—large, with vial," kits used to store user quantities of cocaine with a spoon attached to the top; "Snap kit gold," which refers to a kit with a razor, small spoon, vial, mirror and tube, providing a package to store, transport and ultimately ingest cocaine; "Glass H/P," which refers to a glass hashish pipe; hemostats, plier-like tools sometimes referred to as "roach clips," used both by marijuana smokers to hold cigarettes and by intravenous drug users as part of a tourniquet; and inositol, a common cutting agent for cocaine and heroin.

Agent Giattino also reported that agents executing the first search warrant observed boxes in Main Street's warehouse containing: (1) metal, wooden and glass pipes with or without screens and hashish heads; (2) water pipes; (3) carburetion tubes and devices; (4) smoking and carburetion masks; (5) roach clips; (6) miniature spoons with capacities of one-tenth centimeter or less; (7) chamber pipes; (8) carburetor pipes; (9) electric pipes; (10) air-driven pipes; (11) chillums; (12) bongs; (13) ice pipes or chillers; (14) cocaine freebase kits; and (15) other drug paraphernalia, including crack pipes, crack vials, and drug cutting agents such as inositol, mannite, mannitol and caffeine anhydrous oxide.

## C. The March 30, 1988 Warrant

Based on the items seized and observations made in the course of the March 3, 1988 search, Agent Giattino applied for a warrant to conduct a further search of Main Street Distributors. On March 30, 1988, Magistrate Chrein authorized a search for the fifteen items enumerated above, as well as for books and records of the business reflecting the purchase and sale of drug paraphernalia.

## D. The March 31, 1988 Search

The twenty-one page inventory for the second search of Main Street Distributors reveals the seizure of, among other things, various glass, ceramic and plastic pipes, crack pipes, hashish pipe bowls, cocaine puffers, cocaine snuff kits, cigarette rolling paper, cocaine cutting slates, cocaine scale kits, cocaine cutting blades, triple beam balance scales, cocaine vials with spoons, cocaine drying kits, roach clips, cocaine grinders and spatulas, glassine envelopes, plastic bags, butane lighters, strainers, screens and carburetors.

## II. Discussion

### A. The Legality of the Searches

Defendant recognizes that evidence obtained by officers "acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate" will not be suppressed, even if a reviewing court

subsequently determines that the warrant was unsupported by probable cause. *United States v. Leon,* 468 U.S. 897, 900, 104 S.Ct. 3405, 3409, 82 L.Ed.2d 677 (1984). He argues that in this case there was no reasonable reliance on the first warrant because: (1) the affidavit in support of the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *id.* at 923, 104 S.Ct. at 3420 (quoting *Brown v. Illinois,* 422 U.S. 590, 610–11, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975)); and (2) the affidavit contained information the falsity of which was either known to the affiant, or would have been known but for his reckless disregard of the truth. *Id.* Neither argument has merit. Because this court upholds the validity of the first search, defendant's argument that the second search is defective because it is premised on probable cause derived from the first search, must also be rejected.

### 1. *Probable Cause*

The court finds the March 2, 1988 warrant adequately supported by probable cause.

■ In reviewing any search warrant, it is useful to bear in mind the Supreme Court's admonition that probable cause cannot be "reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). A "commonsense, practical" review of the "totality of the circumstances" is necessary, *id.* at 230, 103 S.Ct. at 2328, to decide whether in a particular factual context the probability of criminal conduct has been established. *See Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969) ("only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause") (citation omitted).

Such an approach is particularly suited to a case involving alleged drug paraphernalia, where the individual components ultimately put together to facilitate drug trafficking and use may, when viewed in isolation, look perfectly innocent. It is from the totality of circumstances, considered in light of common sense, that the probability of an intent to traffic in drug paraphernalia, and not some innocent item, can often be gleened. *See United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965) (cautioning against a "grudging" and "negative" review of the facts presented in support of a warrant).

■ This court is further mindful that, in any case involving a search pursuant to a warrant, once a neutral magistrate has decided that probable cause exists, that determination is entitled to "great deference by reviewing courts." *Illinois v. Gates,* 462 U.S. at 236, 103 S.Ct. at 2331; *United States v. Feliz–Cordero,* 859 F.2d 250, 252 (2d Cir.1988). Indeed, "in a close case any doubts should be resolved in favor of upholding the warrant." *United States v. Jackstadt,* 617 F.2d 12, 14 (2d Cir.), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980); *accord United States v. Leon,* 468 U.S. at 914, 104 S.Ct. at 3416.

■ In this case, the court is persuaded that Agent Giattino's affidavit stated probable cause sufficient to support Magistrate Chrein's issuance of the March 2, 1988 warrant. Customs records demonstrated that Freedom Imports was purchasing large quantities of short glass tubes. According to drug enforcement experts, such tubes are the principal component of "crack" pipes. Such expert opinion " 'is an important factor' " in a determination of probable cause. *United States v. Benevento,* 836 F.2d 60, 71 (2d Cir.1987) (quoting *United States v. Fama,* 758 F.2d 834, 838 (2d Cir.1985)), *cert. denied,* —— U.S. ——, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988).

Defendant gamely argues that, in fact, such tubes have a variety of legitimate uses. For example, he suggests they can be used as stirrers. Common sense and experience, however, indicate a very limited legitimate market for such short glass stirrers. Certainly, for some years now, most drinks have been served with plastic stirrers. Defendant suggests the tubes could be used in "display," but, not surprisingly, fails to articulate what kind of display. He suggests that stirrers are used in

laboratories. Of course, 4–inch stirrers would only be useful in the smallest beakers. Finally, he notes the possibility that lawyers, educators or law enforcement authorities interested in demonstrating, rather than using, the component parts of illicit paraphernalia might use stirrers. The court seriously questions whether any such demonstrative use has reached the point requiring the volume imported by the targets of this investigation.

In any event, the mere fact that—with the use of considerable imagination—counsel can proffer innocent explanations consistent with the facts alleged, does not negate probable cause. *United States v. Fama,* 758 F.2d at 838; *United States v. Ivic,* 700 F.2d 51, 57 (2d Cir.1983).

Further supporting the probability that Freedom Imports and those acquiring glass tubes from it were intentionally dealing in drug paraphernalia is evidence that a Customs agent, who telephoned Freedom Imports, was able to obtain a price quotation for the glass tubes by referring to them as "stems," the common street term for a crack pipe. On the other hand, when an agent sought actually to purchase such stems or tubes from Freedom Imports, three references were demanded. Common sense dictates that a seller of simple drink stirrers would hardly need references from a purchaser. Someone involved in illicit activity, however, would be more likely to be suspicious of a purchaser he did not know. Apparently, since Freedom Imports was selling glass tubes to Main Street Distributors, it had satisfied itself that no risks of exposure were presented from dealing with this buyer. The magistrate was entitled to consider this evidence of unorthodox business dealings for a product with a common illicit use in reaching his conclusion that probable cause existed to believe that these enterprises were engaged in the intentional sale of drug paraphernalia.

Of course, he was also aware that in December 1987, Main Street had acquired the only other item necessary to convert a 4–inch glass tube into a crack pipe, *i.e.,* fine mesh screening. Here again, although defendant proffers innocent uses for mesh screening, whether in tobacco pipes or plumbing supplies, when this court considers this evidence in conjunction with the other products that Agent Giattino was able to link to Main Street Distributors, the probability that defendant was trafficking in drug paraphernalia is adequately established.

In addition to the glass tubes and mesh screens, Agent Giattino advised Magistrate Chrein that Main Street had, in September and October 1987, imported millions of extremely small plastic bags. Once again, common sense suggests a very limited legitimate use for such small bags, particularly in such a large quantity. Agent Giattino, however, was able to apprise Magistrate Chrein that, based on his experience, such bags are often used to package and store user quantities of heroin.

In fact, the routine use of small glassine or plastic bags in the retail distribution of narcotics is something with which virtually every judicial officer in the New York metropolitan area is familiar. *See, e.g., United States v. Cruz,* 797 F.2d 90 (2d Cir.1986); *United States v. Simmons,* 786 F.2d 479 (2d Cir.1986); *United States v. Cruz,* 785 F.2d 399 (2d Cir.1986); *United States v. Ayala,* 769 F.2d 98 (2d Cir.1985); *United States v. Carson,* 702 F.2d 351 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983). Thus, although defendant contends that the bags themselves are not proscribed by § 857, a point to be addressed *infra,* Magistrate Chrein was entitled to consider Main Street's recent purchase of a large quantity of an item so ubiquitous to retail drug trafficking in conjunction with the other evidence in reaching his conclusion that the target premises should be searched for evidence of intentional dealing in proscribed drug paraphernalia.

More to the point, the government was entitled to search and seize such items, since the possession of any tools of the drug trade might very well be probative of intent with respect to the other items alleged to be drug paraphernalia.

This court, accordingly concludes that the first warrant for the search of Main Street Distributors was adequately supported by probable cause.

### 2. *False and Misleading Statements*

Defendant argues that the affidavit contains false and misleading information insofar as: (1) it conveys the impression that plastic bags are paraphernalia proscribed by § 857; (2) the information pertaining to Main Street's purchase of glass tubes is stale; and (3) it suggests the mesh screening was acquired in a form usable exclusively for an illicit purpose.

#### a. *Plastic Bags as Paraphernalia*

■ Defendant's argument that plastic bags are not drug paraphernalia proscribed by § 857, and that the affiant deliberately or recklessly misled the magistrate in this regard, relies on certain aspects of the legislative history of the statute. The Mail Order Drug Paraphernalia Act was apparently derived from a Model Drug Paraphernalia Act, promulgated in 1979 by the Drug Enforcement Administration in an effort to help local governments draft legislation to deal with the problem of drug paraphernalia retailers.[2] The Model Act specifically includes in its definition of drug paraphernalia, products used for "packaging, repackaging, storing and containing" controlled substances. Pesce argues that the omission of this language from § 857 supports the conclusion that Congress did not intend the federal statute to proscribe packaging and storing material.

In fact, however, he cites to no portion of any committee report, hearing or debate that deals with this discrepancy between the statute as enacted and the Model Act.

The court notes that the definitional language of § 857 is quite broad, covering "any equipment, product, or material of any kind which is intended or designed for use in manufacturing, compounding, converting, concealing, producing, processing, preparing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance...." 18 U.S.C. § 857(d). On its face, the statute seems aimed at any paraphernalia intended for use in the chain of drug trafficking, from initial manufacture to ultimate ingestion.

Given this broad statutory language, the unlikelihood that any investigative agent in the field would know of the discrepancy between the Model Act and § 857 pointed out by counsel, the historical treatment of plastic and glassine bags as classic drug paraphernalia, and the ultimate responsibility on the judicial officer for interpretation of the law applicable to any warrant, *see United States v. Thomas*, 757 F.2d 1359, 1368 (2d Cir.), *cert. denied*, 474 U.S. 819, 106 S.Ct. 66, 67, 88 L.Ed.2d 54 (1985); *accord United States v. Leon*, 468 U.S. at 920, 104 S.Ct. at 3419, this court is unpersuaded that defendant has raised even a colorable claim that the magistrate in this case was misled. *See Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978) (To mandate an evidentiary hearing, attack on warrant must be more than conclusory. Allegations of deliberate falsehood or reckless disregard for the truth must be supported by affidavits or sworn statements or an explanation for their absence).[3]

#### b. *Staleness of Information as to Glass Tubes*

■ In support of his argument that the warrant contains stale information regard-

---

**2.** This Model Act is reproduced as Appendix B to this Memorandum and Order.

**3.** Pesce argues that the agent was somehow obligated to apprise the magistrate of the statutory factors pertinent to deciding whether an item is or is not drug paraphernalia. *See* 18 U.S.C. § 857(e) and (f). While these non-exhaustive factors are relevant to assessing probable cause to believe that § 857 has been violated, it simply misperceives the role of the magistrate and the applicant in the warrant process to argue that

the latter misleads a judicial officer in not calling to his attention certain clauses in the law. It is the magistrate's responsibility to determine whether the officer's factual allegations establish probable cause, *United States v. Leon*, 468 U.S. at 921, 104 S.Ct. at 3419, and in so doing, it is the magistrate who must "interpret the law." *United States v. Thomas*, 757 F.2d at 1368. Thus, if a statute is misinterpreted or misapplied, the responsibility for such an error would be with the magistrate and not the applicant.

ing the presence at Main Street of any glass tubes, Pesce notes that the last-known receipt of glass tubes by Freedom Imports was in July 1987. Although Pesce's letter of February 3, 1988 confirms the purchase of an unspecified number of tubes from Freedom Imports, the date of the purchase is not disclosed. In this light, he contends, the magistrate could not reasonably conclude that any tubes would still be on the premises in early March. Moreover, because Customs agents were able to buy glass tubes from Dee's Headway, another target, Pesce urges this court to speculate that the agents may have tried to buy tubes from Main Street but failed because none were available. Defendant then argues that the affiant's failure to disclose this purported unavailability misled the magistrate.

The court notes first that it declines to speculate that agents attempted to purchase any tubes from Main Street. Pesce has not submitted any affidavit or other factual support for this assertion. *See Franks v. Delaware, supra.* Instead, the court will consider the question of staleness solely by reference to the four corners of Agent Giattino's affidavit.

Clearly, a present search must be based on current probable cause and not on facts existing in the past, unless, of course, there is reason to believe that those facts are still in existence. *United States v. Beltempo,* 675 F.2d 472, 477 (2d Cir.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982). But no "arbitrary 'cut-off'" dates or "rigid formula[s]" control a determination of currency. *Id.* at 478. A court must consider the type of criminal conduct alleged, the length of time of the conduct and the type of evidence to be seized. *United States v. McGrath,* 622 F.2d 36, 42 (2d Cir.1980). Especially where an offense is deemed continuing, considerable flexibility in assessing currency is appropriate. *United States v. Beltempo,* 675 F.2d at 477.

In this case, there is no information as to how long Main Street was alleged to have trafficked in drug paraphernalia. But the very nature of the crime alleged is certain-ly more likely to be ongoing than haphazard. Moreover, in this case, the place to be searched, Main Street Distributors, was, from all outward appearances, an established business enterprise, not some temporary and easily-abandoned location. The magistrate could thus reasonably conclude that Main Street, like most businesses, had an inventory of regularly stocked items that it offered for sale. In this context, a letter written on February 3, 1988, confirming the purchase of glass stirrers can reasonably be presumed to refer to a recent purchase and can support the inference that such items are still a part of the regular inventory on March 2, 1988.

In any event, the government also sought leave to search for any evidence pertaining to the final disposition, sale, transfer or distribution of the glass tubes. There is no reason to think that an on-going business would not have records on its premises for sales made within the last year. Indeed, defendant does not even challenge the currency of the warrant in this regard.

### c. The Form of the Mesh Screening

Pesce argues that Agent Giattino deliberately misled the magistrate into thinking the small gauge mesh screening being imported by Main Street was in a form immediately usable in crack pipes. In fact, he contends that the screen was imported in large bolts and would need to have been cut to fit crack pipes.

Nothing in the affidavit says anything about the form in which the screening was imported. Agent Giattino stated only that Main Street "imported into the United States from Japan .1 millimeter gauge stainless steel mesh screens. These small gauge flexible screens are a component of crack pipes." Only a "grudging" and "negative" reading of the affidavit would support the conclusion that this statement in any way misled the magistrate. *Contra, United States v. Ventresca,* 380 U.S. at 108, 85 S.Ct. at 745. Even if the magistrate had been told that the screening was imported in large bolts, this court concludes that this fact would have made no

difference whatsoever to the determination of probable cause as Main Street had now acquired yet another component essential to the sale of crack pipes.

This court therefore concludes that no knowingly or recklessly false or misleading statements were made to the magistrate to support the issuance of the first warrant.

## B. *The Constitutionality of 21 U.S.C. § 857*

Defendant challenges the constitutionality of 21 U.S.C. § 857 on three grounds: (1) the definition of "drug paraphernalia" is impermissibly vague as applied to him; (2) the absence of a scienter requirement violates due process; and (3) the exemptions impermissibly shift the burden of proof with respect to intent from the prosecution to the defense. None of these contentions has merit.

### 1. *Scienter*

Pesce contends that the language of § 857 is devoid of any requirement that the defendant on trial intentionally dealt in drug paraphernalia and that this omission was deliberate. He specifically points to certain language pertinent to intent found in the Model Act, but not contained in § 857, as evidence that Congress did not intend scienter to be an element of § 857. The court considers Pesce's argument mindful of certain basic principles of statutory construction and finds it to be without merit.

■ "The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion," but a tenet so basic to our jurisprudence that a scienter requirement is presumed with respect to all offenses cognizable at common law, whether the legislature expressly states this element or not. *Morissette v. United States*, 342 U.S. 246, 250–52, 72 S.Ct. 240, 243–44, 96 L.Ed. 288 (1952); *accord, e.g., Liparota v. United States*, 471 U.S. 419, 424–28, 105 S.Ct. 2084, 2087–89, 85 L.Ed.2d 434 (1985). Due process permits a narrow exception, imposing strict criminal liability absent any proof of a defendant's scienter, with respect to

certain regulatory measures, *Morissette v. United States*, 342 U.S. at 258, 72 S.Ct. at 247 (citing *United States v. Balint*, 258 U.S. 250, 251–52, 42 S.Ct. 301, 302, 66 L.Ed. 604 (1922)), particularly where penalties are relatively small and conviction does no great damage to reputation, *id.* at 256, 72 S.Ct. at 246. The government does not here argue that § 857 is such a strict liability statute. Indeed, because strict liability crimes are "generally disfavored," courts have required "far more than the simple omission of the appropriate phrase from [a] statutory definition ... to justify dispensing with an intent requirement." *United States v. United States Gypsum Co.*, 438 U.S. 422, 438, 98 S.Ct. 2864, 2874, 57 L.Ed. 2d 854 (1978). Instead, "[a]bsent indication of contrary purpose in the language or legislative history of [a] statute," scienter is presumed to be an element of any federal crime. *Liparota v. United States*, 471 U.S. at 425, 105 S.Ct. at 2088. This is, of course, consistent with the principle that laws be read to avoid an unconstitutional result. *E.g., Screws v. United States*, 325 U.S. 91, 98, 65 S.Ct. 1031, 1033, 89 L.Ed. 1495 (1945); *New England Accessories Trade Ass'n, Inc. v. Tierney*, 691 F.2d 35, 36 n. 2 (1st Cir.1982) (upholding Maine drug paraphernalia statute); *Casbah, Inc. v. Thone*, 651 F.2d 551, 558 (8th Cir.1981) (upholding Nebraska drug paraphernalia statute), *cert. denied*, 455 U.S. 1005, 102 S.Ct. 1642, 71 L.Ed.2d 874, *reh'g denied*, 456 U.S. 950, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982).

In this case, neither the language of § 857 nor its legislative history supports defendant's argument that scienter was deliberately omitted from the statute.

In its definitional clause, § 857 provides that drug paraphernalia means only those items "primarily intended or designed for use" in conjunction with illicit drugs. This language strongly suggests that Congress intended "to require *some* mental state with respect to *some* element of the crime." *See Liparota v. United States*, 471 U.S. at 424, 105 S.Ct. at 2087 (ambiguity as to what element of the food stamp offense Congress intended to modify by its use of

the word "knowingly") (emphasis in original).

Defendant argues that the language can be read to refer to the intent of some third party, for example, the manufacturer of a product who designed it with the intent that it be used in conjunction with drugs, or a user, who purchases a product intending to use it with drugs. In short, he contends that his own intent is not a specific element of the offense, and that he risks prosecution and conviction based on the transferred intent of others.

The legislative history of § 857 does not support such an argument. In hearings conducted by the House Subcommittee on Crime on May 8, 1986, Congressman McCollum explored the element of intent with Congressman Mel Levine, the author of § 857.

> MCCOLLUM. ... I am concerned to whom this is applied.
>
> For example, it seems very clear the word "designed," that would be very narrow, I don't have a real problem with that.... But what isn't clear is the fact that you have got another word in there "primarily intended for the use."
>
> Do you mean to say that intended, even though it was designed for multiple uses, that at the time, the seller, the particular seller of this drug paraphernalia sold it, that it was his intent in selling it that it be used for the purposes described; is that the intent that the prosecutor would have to prove, the intent of the seller, or just what have you got in mind?
>
> MR. LEVINE. I believe that the thrust of this language in the section that you are referring to, is designed both in the context of the model act, and designed by us in this act to try to identify as clearly as we can, subject, obviously to the evidentiary application of it in a trial court, to identify an intent to use the particular item as drug paraphernalia, in a drug related context.
>
> MR. MCCOLLUM. An intent on the part of whom; on the part of the seller?
>
> MR. LEVINE. Well, it would depend on who is being prosecuted, if it was the seller, it would be the intent on the part of the seller. It would be the defendant. *It would be the intent on the part of the defendant in a particular trial.*
>
> My principal concerns in this area have always been with regard to sellers and manufacturers, but it would be the application with regard to whomever the defendant would be under the provisions of this act.

*Mail Order Drug Paraphernalia Control Act: Hearings on H.R. 1625 Before the Subcomm. on Crime of the House Committee of the Judiciary,* 99th Cong. 2nd Sess. 19–21 (1986) (hereinafter "Hearings at ___") (emphasis added).

Subsequently in the hearings, Mr. McCollum would reiterate Mr. Levine's point to a witness testifying on behalf of the Justice Department: "the intent language in this statute, apparently by the will of the authors, would apply to the seller primarily, or whoever the person is that is being accused." Hearings at 46.

The court cites at length to these hearings to make two points: first, there can be no doubt that Congress did intend to include a scienter element in § 857; and second, the only person whose intent Congress deemed relevant for purposes of prosecutions under the statute is that of the defendant on trial. Defendant Pesce has gone to great lengths to quote selectively from the hearings in support of his argument that Congress deliberately excluded any scienter element from the crime. When his excerpts are read in context, as this court has done in reviewing the entire transcript of hearings on the legislation, they do not support such a conclusion.

Equally unavailing is Pesce's attempt to cite differences between § 857 and portions of the 1979 Model Act to support the claim that a defendant's scienter was purposefully omitted from the federal crime.

The criminal aspects of the Model Act are contained in two distinct sections: Article I, which is definitional; and Article II, which provides model language for discrete offenses. In Article I, the Model Act defines as drug paraphernalia all equipment, products and materials of any kind which "are used, intended for use, or designed for

use," in conjunction with drugs. Certain offenses outlined in Article II also contain an intent requirement. For example: "It is unlawful for any person to deliver, possess with intent to deliver, or manufacture with intent to deliver, drug paraphernalia, knowing, or under circumstances where one reasonably should know, that it will be used [in conjunction with drugs]." It is to the lack of any language in § 857 akin to that in the Model Act's offense sections expressly pertaining to the knowledge of the distributor that Pesce points in arguing that the federal statute therefore deliberately excludes a scienter requirement.

Pesce's argument is at odds with the decisions of various federal courts which have considered challenges to local legislation based on the Model Act and uniformly concluded that the definitional section does itself state a scienter element with respect to the defendant on trial. *See Garner v. White,* 726 F.2d 1274, 1279 (8th Cir.1984) (Model Act's definition of drug paraphernalia uniformly limited to "items which the *accused intended* for use with illegal drugs") (emphasis in original); *Nova Records, Inc. v. Sendak,* 706 F.2d 782, 787 (7th Cir.1983) (scienter requirement found in definitional section of Model Act); *General Stores, Inc. v. Bingaman,* 695 F.2d 502, 504 (10th Cir.1982) (intent referred to in definitional section refers to that of person charged with violating the statute); *Levas and Levas v. Village of Antioch,* 684 F.2d 446, 450 (7th Cir.1982) (scienter requirement found in drug paraphernalia definition); *Tobacco Accessories and Novelty Craftsmen Merchants Ass'n of Louisiana v. Treen,* 681 F.2d 378, 383–85 (5th Cir. 1982) (definition of drug paraphernalia requires proof of specific intent: " 'intended to use' language applies to the state of mind of the individual charged with the offense of selling, distributing or displaying drug paraphernalia;" "the 'designed for use' language ... similarly applies only to manufacturers, for their own acts of design"); *Florida Businessmen for Free Enterprise v. City of Hollywood,* 673 F.2d 1213, 1219 (11th Cir.1982) ("the three states of mind on which the definition of drug paraphernalia relies—(1) 'used,' (2) 'intended for use,' or (3) 'designed for use'—require proof of general criminal intent of the accused"); *Hejira Corp. v. MacFarlane,* 660 F.2d 1356 (10th Cir.1981) (statutory definition of drug paraphernalia includes a subjective intent on the part of the defendant).[4]

Admittedly, some courts have found support for their interpretation of a scienter element in the Model Act's definitional section by reference to those sections in Article II relating to. the intent necessary to commit the specific offense. *E.g., Murphy*

---

**4.** Many of these cases, particularly those decided after 1982, have relied in large part on the Supreme Court's decision in *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), a case which "fundamentally restructure[d] the analysis" of drug paraphernalia laws. *Record Head Corp. v. Sachen,* 682 F.2d 672, 674 n. 1 (7th Cir.1982). In upholding a local drug paraphernalia ordinance not based on the Model Act, the Court took note of the historical "hostility of some lower courts to drug paraphernalia laws." *Village of Hoffman Estates v. Flipside,* 455 U.S. at 497 n. 9, 102 S.Ct. at 1192 n. 9. Nevertheless, it found that a prohibition, whether criminal or quasi-criminal, *id.* at 500, 102 S.Ct. at 1194, against the sale of items "designed or marketed for use" with drugs was not unconstitutionally vague. It found the reference to design plainly to refer to "the design of the manufacturer, not the intent of the retailer or customer." *Id.* at 501, 102 S.Ct. at 1194. Marketed for use "describes a retailer's intentional display and marketing of merchan-

dise.... The standard requires scienter, since a retailer could scarcely 'market' items 'for' a particular use without intending that use." *Id.* at 502, 102 S.Ct. at 1195.

Defendant's argument that the Supreme Court was in any way hesitant about the "design" language, or that "marketed for use" should somehow be seen as different, for purposes of scienter, than the "intended for use" in § 857 has not been the view of the Circuit court decisions cited insofar as they have considered intent language derived from the definitional section of the Model Act. Indeed, such a distinction makes little sense. *See Record Head Corp. v. Sachen,* 682 F.2d at 683 (Pell, J., dissenting); *Nova Records, Inc. v. Sendak,* 706 F.2d at 790 and n. 6.

Given the clear Congressional affirmation that the intent of the defendant, whether he be a designer or seller, is to be an element of any prosecution pursuant to § 857, defendant's attempts to parse *Village of Hoffman Estates* too finely must be rejected.

*v. Matheson,* 742 F.2d 564, 571 (10th Cir. 1984) (any ambiguity as to whose intent at issue in definitional term clarified by reading statute as a whole); *New England Accessories Trade Ass'n v. Tierney,* 691 F.2d at 36 (a fair reading of the statute as a whole, including the portions defining the substantive offenses which focus on the mental state of the accused, indicate that the intent referred to in the definition section is that of the person alleged to have violated the statute); *Casbah, Inc. v. Thone,* 651 F.2d at 559 (statute read as a whole confirms that the mental state required to render an item drug paraphernalia requires proof of intent by person alleged to have violated the statute).

But the scienter required by the definitional section is not dependent, as Pesce urges, on a parallel reference to intent in the offense section of the Model Act. In *Levas and Levas v. Village of Antioch,* the Seventh Circuit considered a challenge to a local paraphernalia ordinance that set out "a scienter requirement only in the definition of drug paraphernalia." 684 F.2d at 450. As Chief Judge Cummings quite sensibly observed, this scienter was necessarily incorporated into the offense section by reference therein to the term "drug paraphernalia." *Id.* This logic is clearly applicable here.

Two pre-*Village of Hoffman Estates* cases cited by defendant, *Franza v. Carey,* 518 F.Supp. 324 (S.D.N.Y.1981) and *Brache v. County of Westchester,* 507 F.Supp. 566 (S.D.N.Y.), *rev'd,* 658 F.2d 47 (2d Cir.1981), *cert. denied,* 455 U.S. 1005, 102 S.Ct. 1643, 71 L.Ed.2d 874 (1982), are not to the contrary. Both plainly recognize that there is a scienter element to be derived from the definitional section of the Model Act. The government must prove that a defendant intended an item to be used for a drug-related purpose. It is this conduct that "defines drug paraphernalia." *Franza v. Carey,* 518 F.Supp. at 339. What they also find is a second, and different, scienter requirement that must be satisfied for prosecutions alleging delivery of drug paraphernalia with knowledge that it will be used in conjunction with a controlled substance. The government must prove actual or constructive knowledge by the defendant that the sale or potential sale will facilitate illegal drug use. "Under this standard ... a seller who intended an item to have a drug-related purpose would not violate the Model Act if he sold it to an individual who he knew would not use it for a drug-related purpose." *Id.*

By contrast, § 857 is not concerned with whether an ultimate purchaser will in fact use an item in conjunction with drugs and whether a defendant knows this. Its focus is simply on a defendant's use of the mails, or foreign or interstate commerce, to facilitate transactions involving items that a defendant has designed or intends for use as drug paraphernalia. So long as the defendant's scienter is established in this regard, *i.e.,* so long as drug paraphernalia is defined by the defendant's intent, there can be no question—and certainly the defendant does not raise one—as to Congress's ability to regulate such conduct regardless of what an ultimate purchaser contemplates or what the defendant knows in that regard.

The definitional language of § 857, its legislative history and the interpretation of similar clauses in other statutes persuade this court that scienter is an intended requisite element of the offense charged, that it serves to define drug paraphernalia, and that the government will therefore be required to prove at trial that Pesce either designed the items listed in the indictment for use with controlled substances or intended them to be for drug use.

### 2. *Vagueness*

A statute violates due process if its prohibitions are not clearly defined. *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). Such impermissible vagueness does not mean simply that an enactment " 'requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather ... that [it specifies] no standard of conduct ... at all.' " *Village of Hoffman Estates v. Flipside,* 455 U.S. at 495 n. 7, 102 S.Ct. at 1191 n. 7

(quoting *Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed. 2d 214 (1971)). Vagueness challenges generally require two inquiries: first, does the law "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited;" and second, does the law "provide explicit standards for those who apply them." *Grayned v. City of Rockford,* 408 U.S. at 108, 92 S.Ct. at 2298 (footnote omitted).

### a. Notice to Defendant

The thrust of Pesce's claim that § 857 is unconstitutionally vague as applied to him is that the problem of transferred intent makes it impossible for him to know what conduct is prohibited since he may have no idea what his supplier or customer intends with respect to the products at issue. This court has already made clear that § 857 does not contemplate prosecutions based on the transferred intent of others. Instead, proof of a defendant's own scienter is an essential element of § 857. The Supreme Court has often recognized that a "scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *E.g., Village of Hoffman Estates v. Flipside,* 455 U.S. at 499, 102 S.Ct. at 1193 (footnote omitted); *accord Liparota v. United States,* 471 U.S. at 427, 105 S.Ct. at 2089 (*mens rea* requirement "ensures that criminal statutes will provide fair warning concerning conduct rendered illegal"). Particularly with respect to drug paraphernalia statutes, "[s]ince very few of the items [the law] seeks to reach are single-purpose items, scienter is the only practical way of defining when a multi-purpose object becomes paraphernalia." *Levas and Levas v. Village of Antioch,* 684 F.2d at 453.

■ Pesce nevertheless argues that because § 857 refers to items *"primarily intended or designed for use"* in conjunction with drugs, vagueness still infects the statute. In fact, a number of courts have already heard, and rejected, challenges to the use of the modifier "primarily" in drug paraphernalia legislation. *Garner v.*

*White,* 726 F.2d at 1281; *Nova Records, Inc. v. Sendak,* 706 F.2d at 789; *Hejira Corp. v. MacFarlane,* 660 F.2d at 1365. Their uniform conclusion has been that the inclusion of the word "primarily" in the scienter section of the statute "appear[s] more likely to benefit than to burden a defendant," *id.,* by "narrow[ing] the scope of the Act," *Garner v. White, supra.* It requires proof that the illegal intent of a defendant must predominate. *Nova Records, Inc. v. Sendak, supra.* This court concurs that no impermissible vagueness is injected into the statute by use of the modifier "primarily."

### b. Arbitrary and Discriminatory Enforcement

■ Pesce argues that § 857 lacks sufficiently precise standards to guide agents and courts as to what is prohibited.

The question of arbitrary enforcement is present in all drug paraphernalia statutes precisely because the items at issue are generally capable of innocent as well as dangerous use. The problem is generally minimized by providing a list of non-exhaustive factors pertinent to determining when an item is paraphernalia. Common sense recognizes that "the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions," *Boyce Motor Lines v. United States,* 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367 (1952), and that effective law enforcement always "requires the exercise of some degree of police judgment." *Grayned v. City of Rockford,* 408 U.S. at 114, 92 S.Ct. at 2302. Some measure of flexibility is particularly appropriate with respect to conduct, such as that proscribed by § 857, that is rendered criminal only by virtue of the intent of the defendant. In such a situation, statutory factors can help to articulate circumstances most likely to be probative on the question of defendant's intent. But as Judge Cardozo cautioned in the civil context: "the springs of conduct are subtle and varied." *De Cicco v. Schweizer,* 221 N.Y. 431, 438, 117 N.E. 807 (1917). It is almost impossible to reduce

the question of human intent to a scientifically precise formula.

Section 857 does provide eight factors, drawn directly from the Model Act, that "may" be considered, along with "all other logically relevant factors" in determining when a target is intentionally dealing in drug paraphernalia. Three of them—the instructions or descriptive materials provided with an item explaining its use and the manner in which the item is displayed, 21 U.S.C. § 857(e)(1), (2), and (4)—are "obviously highly probative." *Levas and Levas v. Village of Antioch*, 684 F.2d at 454. If it is the defendant himself who is responsible for these instructions or descriptions, or who has arranged a display, such would constitute direct evidence of his intent. If some third party is involved in this conduct, circumstantial evidence of intent might still be derived based on the relationship of the defendant to such a party, and his own awareness or possibly even adoption of the conduct.

Two other factors, while perhaps "less probative" insofar as they are more likely to reflect circumstantial rather than direct evidence of intent are "still relevant:" the ratio of sales of the items to the total sales of the business, 21 U.S.C. § 857(e)(6), and the existence and scope of legitimate uses of the item in the community, 21 U.S.C. § 857(e)(7). *Id.* Certainly in this case the limited legitimate use for the items in question, when compared to the volume in which the targets were dealing, was relevant to a finding of probable cause to support a search.

The three remaining factors provided for in § 857, national and local advertising, 21 U.S.C. § 857(e)(3), evidence of legitimate business dealings, such as a license to distribute or deal in tobacco products, 21 U.S.C. § 857(e)(5), and expert testimony, 21 U.S.C. § 857(e)(8), have, in the absence of other factors described above, been criticized as "of doubtful relevance." *Record Head Corp. v. Sachen*, 682 F.2d at 677. *But see Levas and Levas v. Village of Antioch*, 684 F.2d at 454 (presence of possibly "inadequate" factors not enough to sustain vagueness challenge when statute also provided specific and relevant factors).

In fact, this court does not agree that these three factors are not relevant. Certainly if a defendant himself advertises the products he manufactures or offers for sale as capable of a particular illicit use, such evidence would be directly probative of his intent. If he imported products on the basis of a supplier's advertisement that the product was capable of use with drugs, such evidence, while perhaps not conclusive of his intent, would have circumstantial relevance. Similarly, the advertising engaged in by a defendant's customers could be probative of defendant's intent if evidence can be adduced that defendant was aware of this advertising at the time he supplied the product.

A reputation for legitimate dealing in tobacco products, while also not conclusive, would, in certain circumstances, shed light on conduct that could otherwise be misinterpreted.

Finally, expert testimony is often useful in explaining the operation of almost any aspect of the narcotics trade. *See, e.g., United States v. Kusek*, 844 F.2d 942, 949 (2d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 157, 102 L.Ed.2d 128 (1988). While it is ultimately the factfinder who must decide whether an individual is intentionally engaging in unlawful activity, *see, e.g., United States v. Garcia*, 848 F.2d 1324 (2d Cir.1988), experts have routinely been permitted to educate courts and juries about the seemingly innocuous language used as codes and jargon common in the trade as probative evidence that the intent of the parties was to arrange drug deals. *See, e.g., United States v. Kusek*, 844 F.2d at 946 (agent testifies that term "paint" was used as code for heroin); *United States v. Hoffman*, 832 F.2d 1299, 1310 (1st Cir. 1987) (agent testifies that "six cases of wine" was code for six kilograms of cocaine; further testifies to meaning of "rock" and "fluff" when used in drug trade); *United States v. Cirillo*, 499 F.2d 872, 881 (2d Cir.), *cert. denied*, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974) (agent testifies that "kids out of school,"

"dresses," and "half filled out income tax forms" all were codes to conceal heroin transactions). By the same token an expert's opinion as to the frequency with which various items are used in conjunction with drugs would be of some relevance to a determination of a defendant's intent to deal in narcotics paraphernalia. *See* Fed.R. Evid. 702.

Regardless of whether or not each factor provided for in § 857(e) is equally relevant and specific, this court is persuaded that when they are "taken as a whole they serve to channel enforcement activities by providing objective measures for the evaluation of specific factual situations." *Murphy v. Matheson*, 742 F.2d at 574. Most important, they ensure that any decisions about prohibited dealing in drug paraphernalia are "susceptible to appropriate reevaluation: the prosecutor can assess the arresting officer's case, the trial court can put the prosecutor to his proof, and the reviewing court can examine the trial court's findings." *Levas and Levas v. Village of Antioch*, 684 F.2d at 454. Of course, burdens of proof may differ at various stages in a criminal proceeding and facts sufficient to establish probable cause that a person is intentionally dealing in drug paraphernalia may be far less than what is required to establish proof beyond a reasonable doubt. But that does not alter the fact that § 857 does provide a useful guide that can be applied at each stage of the proceedings. Similarly, "the fact that different minds may reach different results" when applying the factors "to determine whether a given object falls within the statutory definition of drug paraphernalia does not render [a] statute void for vagueness." *Hejira Corp. v. MacFarlane*, 660 F.2d at 1367. The Constitution prohibits arbitrary and discriminatory application of the law; it does not insist upon mathematical certainty.

This court is persuaded that § 857 does provide reasonable objective factors for enforcement sufficient to defeat the charge of vagueness.

### 3. *Burden of Proof*

■ Pesce's contention that by providing exemptions to liability, § 857(f) impermissibly shifts the burden of proof to him is unpersuasive. As with any criminal statute providing exemptions, *see* 21 U.S.C. § 841, § 857 simply recognizes possible legal uses for the items in question. This does not change the burden of proof. Whether the defendant chooses affirmatively to introduce evidence of legitimate uses for the items charged in the indictment or whether he prefers to stand by his constitutional right to offer no evidence, it will be the United States that must prove beyond a reasonable doubt that Pesce engaged in the conduct charged with the intent that the items at issue be used in conjunction with drugs. *Cf. United States v. Dunn*, 779 F.2d 157, 160 (2d Cir.1985) (government has burden of proving beyond a reasonable doubt defendant's predisposition to commit crime when evidence of inducement is adduced); *United States v. Aitken*, 755 F.2d 188 (1st Cir.1985) (defendant's interjection of good faith defense to tax charge required government to prove beyond a reasonable doubt his subjective intent to violate the law); *United States v. Mitchell*, 725 F.2d 832, 836–37 (2d Cir.1983) (although defendant must present some evidence of each element of duress and coercion defense before being entitled to a charge on this issue, once this is done, government must disprove defense beyond a reasonable doubt); *United States v. Burse*, 531 F.2d 1151, 1153 (2d Cir.1976) (where defendant raises alibi defense, it is the government that must prove beyond a reasonable doubt his presence at the time and place of the alleged offense).

The court finds that § 857 does not impermissibly shift the burden of proof on any element of the offense to the defendant.

### CONCLUSION

For the reasons stated in this opinion, the court finds the two searches of Main Street Distributors to have been in conformity with the law and, therefore, declines to suppress evidence obtained in the

course thereof. It further finds that there is no merit to defendant's constitutional challenge to 21 U.S.C. § 857. Accordingly, the motion to dismiss the indictment is denied.

SO ORDERED.

## APPENDIX A

21 U.S.C. § 857:

*Use of Postal Service for sale of drug paraphernalia*

### Unlawfulness

(a) It is unlawful for any person—

(1) to make use of the services of the Postal Service or other interstate conveyance as part of a scheme to sell drug paraphernalia;

(2) to offer for sale and transportation in interstate or foreign commerce drug paraphernalia; or

(3) to import or export drug paraphernalia.

### Penalties

(b) Anyone convicted of an offense under subsection (a) of this section shall be imprisoned for not more than three years and fined not more than $100,000.

### Seizure and forfeiture

(c) Any drug paraphernalia involved in any violation of subsection (a) of this section shall be subject to seizure and forfeiture upon the conviction of a person for such violation. Any such paraphernalia shall be delivered to the Administrator of General Services, General Services Administration, who may order such paraphernalia destroyed or may authorize its use for law enforcement or educational purposes by Federal, State, or local authorities.

### Definition of "drug paraphernalia"

(d) The term "drug paraphernalia" means any equipment, product, or material of any kind which is primarily intended or designed for use in manufacturing, compounding, converting, concealing, producing, processing, preparing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance in violation of the Controlled Substances Act (title II of Public Law 91–513) [21 U.S.C.A. § 801 et seq.]. It includes items primarily intended or designed for use in ingesting, inhaling, or otherwise introducing marijuana, cocaine, hashish, hashish oil, PCP, or amphetamines into the human body, such as—

(1) metal, wooden, acrylic, glass, stone, plastic, or ceramic pipes with or without screens, permanent screens, hashish heads, or punctured metal bowls;

(2) water pipes;

(3) carburetion tubes and devices;

(4) smoking and carburetion masks;

(5) roach clips: meaning objects used to hold burning material, such as a marihuana cigarette, that has become too small or too short to be held in the hand;

(6) miniature spoons with level capacities of one-tenth cubic centimeter or less;

(7) chamber pipes;

(8) carburetor pipes;

(9) electric pipes;

(10) air-driven pipes;

(11) chillums;

(12) bongs;

(13) ice pipes or chillers;

(14) wired cigarette papers; or

(15) cocaine freebase kits.

### Matters considered in determination of what constitutes drug paraphernalia:

(e) In determining whether an item constitutes drug paraphernalia, in addition to all other logically relevant factors, the following may be considered:

(1) instructions, oral or written, provided with the item concerning its use;

(2) descriptive materials accompanying the item which explain or depict its use;

(3) national and local advertising concerning its use;

(4) the manner in which the item is displayed for sale;

(5) whether the owner, or anyone in control of the item, is a legitimate supplier of like or related items to the community,

such as a licensed distributor or dealer of tobacco products;

(6) direct or circumstantial evidence of the ratio of sales of the item(s) to the total sales of the business enterprise;

(7) the existence and scope of legitimate uses of the item in the community; and

(8) expert testimony concerning its use.

Exemptions

(f) This section shall not apply to—

(1) any person authorized by local, State, or Federal law to manufacture, possess, or distribute such items; or

(2) any item that, in the normal lawful course of business, is imported, exported, transported, or sold through the mail or by any other means, and primarily intended for use with tobacco products, including any pipe, paper, or accessory.

APPENDIX B

MODEL DRUG PARAPHERNALIA ACT

ARTICLE I

(Definitions)

Section (insert designation of definitional section) of the Controlled Substances Act of this State is amended by adding the following after paragraph (insert designation of last definition in section):

"( ) The term 'Drug Paraphernalia' means all equipment, products and materials of any kind which are used, intended for use, or designed for use, in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance in violation of this Act (meaning the Controlled Substances Act of this State). It includes, but is not limited to:

(1) Kits used, intended for use, or designed for use in planting, propagating, cultivating, growing or harvesting of any species of plant which is a con-controlled (sic) substance or from which a controlled substance can be derived;

(2) Kits used, intended for use, or designed for use in manufacturing, compounding, converting, producing, processing, or preparing controlled substances;

(3) Isomerization devices use, intended for use, or designed for use in increasing the potency of any species of plant which is a controlled substance;

(4) Testing equipment used, intended for use, or designed for use in identifying, or in analyzing the strength, effectiveness or purity of controlled substances;

(5) Scales and balances used, intended for use, or designed for use in weighing or measuring controlled substances;

(6) Diluents and adulterants, such as quinine hydrochloride, mannitol, mannite, dextrose and lactose, used, intended for use, or designed for use in cutting controlled substances;

(7) Separation gins and sifters used, intended for use, or designed for use in removing twigs and seeds from, or in otherwise cleaning or refining, marihuana;

(8) Blenders, bowls, containers, spoons and mixing devices used, intended for use, or designed for use in compounding controlled substances;

(9) Capsules, balloons, envelopes and other containers used, intended for use, or designed for use in packaging small quantities of controlled substances;

(10) Containers and other objects used, intended for use, or designed for use in storing or concealing controlled substances;

(11) Hypodermic syringes, needles and other objects used, intended for use, or designed for use in parenterally injecting controlled substances into the human body;

(12) Objects used, intended for use, or designed for use in ingesting, inhaling, or otherwise introducing marihuana, cocaine, hashish, or hashish oil into the human body, such as:

(a) Metal, wooden, acrylic, glass, stone, plastic, or ceramic pipes with or without screens, permanent screens, hashish heads, or punctured metal bowls;

(b) Water pipes;

(c) Carburetion tubes and devices;

(d) Smoking and carburetion masks;

(e) Roach clips: meaning objects used to hold burning material, such as a marihuana cigarette, that has become too small or too short to be held in the hand;

(f) Miniature cocaine spoons, and cocaine vials;

(g) Chamber pipes;

(h) Carburetor pipes;

(i) Electric pipes;

(j) Air-driven pipes;

(k) Chillums;

(*l*) Bongs;

(m) Ice pipes or chillers; "

"In determining whether an object is Drug paraphernalia, a court or other authority should consider, in addition to all other logically relevant factors, the following:

(1) Statements by an owner or by anyone in control of the object concerning its use;

(2) Prior convictions, if any, of an owner, or of anyone in control of the object, under any State or Federal law relating to any controlled substance;

(3) The proximity of the object, in time and space, to a direct violation of this Act;

(4) The proximity of the object to controlled substances;

(5) The existence of any residue of controlled substances on the object;

(6) Direct or circumstantial evidence of the intent of an owner, or of anyone in control of the object, to deliver it to persons whom he knows, or should reasonably know, intend to use the object to facilitate a violation of this Act; the innocence of an owner, or of anyone in control of the object, as to a direct violation of this Act shall not prevent a finding that the object is intended for use, or designed for use as Drug paraphernalia;

(7) Instructions, oral or written, provided with the object concerning its use;

(8) Descriptive materials accompanying the object which explain or depict its use;

(9) National and local advertising concerning its use;

(10) The manner in which the object is displayed for sale;

(11) Whether the owner, or anyone in control of the object, is a legitimate supplier of like or related items to the community, such as a licensed distributor or dealer of tobacco products;

(12) Direct or circumstantial evidence of the ratio of sales of the object(s) to the total sales of the business enterprise;

(13) The existence and scope of legitimate uses for the object in the community;

(14) Expert testimony concerning its use."

## ARTICLE II

### (Offenses and Penalties)

SECTION (designation of offenses and penalties section) of the Controlled Substances Act of this State is amended by adding the following after (designation of last substantive offense):

"SECTION (A) (Possession of Drug Paraphernalia)

It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this Act. Any person who violates this section is guilty of a crime and upon conviction may be imprisoned for not more than (    ), fined not more than (    ), or both."

"SECTION (B) (Manufacture or Delivery of Drug Paraphernalia)

It is unlawful for any person to deliver, possess with intent to deliver, or manufacture with intent to deliver, drug paraphernalia, knowing, or under circumstances where one reasonably should know, that it will be used to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, pro-

cess, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this Act. Any person who violates this section is guilty of a crime and upon conviction may be imprisoned for not more than (    ), fined not more than (    ), or both."

"SECTION (C) (Delivery of Drug Paraphernalia to a Minor)

Any person 18 years of age or over who violates Section (B) by delivering drug paraphernalia to a person under 18 years of age who is at least 3 years his junior is guilty of a special offense and upon conviction may be imprisoned for not more than (    ), fined not more than (    ), or both."

"SECTION (D) (Advertisement of Drug Paraphernalia)

It is unlawful for any person to place in any newspaper, magazine, handbill, or other publication any advertisement, knowing, or under circumstances where one reasonably should know, that the purpose of the advertisement, in whole or in part, is to promote the sale of objects designed or intended for use as drug paraphernalia. Any person who violates this section is guilty of a crime and upon conviction may be imprisoned for not more than (    ), fined not more than (    ), or both."

### ARTICLE III

### (Civil Forfeiture)

Section (insert designation of civil forfeiture section) of the Controlled Substances Act of this State is amended to provide for the civil seizure and forfeiture of drug paraphernalia by adding the following after paragraph (insert designation of last category of forfeitable property):

"(    ) all drug paraphernalia as defined by Section (    ) of this Act."

### ARTICLE IV

### (Severability)

If any provision of this Act or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are severable.