**UNITED STATES of America, Appellee,**

v.

**HONG–LIANG LIN, Defendant–Appellant.**

**No. 250, Docket 91–1297.**

United States Court of Appeals, Second Circuit.

Argued Oct. 16, 1991.

Decided May 1, 1992.

David Samel, White Plains, N.Y., for defendant-appellant.

Patricia E. Notopoulos, Asst. U.S. Atty., E.D.N.Y. (Andrew J. Maloney, U.S. Atty., Emily Berger, Asst. U.S. Atty., of counsel), for appellee.

Before: KEARSE, PRATT, and McLAUGHLIN, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Drug dealers are not the only "entrepreneurs" who profit from the sale of illegal narcotics in this country. In addition to the drug traders, a burgeoning sub-industry of merchants peddle drug paraphernalia that serves to facilitate and promote the use of illegal drugs. As part of its overall legisla-

tive assault on drug use, congress enacted the Mail Order Drug Paraphernalia Control Act, Pub.L. No. 99–570, §§ 1821–23, 100 Stat. 3207–51 (1986) (*codified at* 21 U.S.C. § 857 (1988)) ["Paraphernalia Act"], *repealed and reenacted by* Crime Control Act of 1990, Pub.L. No. 101–647, § 2401, 104 Stat. 4789, 4858–59 (Nov. 29, 1990) (*codified at* 21 U.S.C. § 863), which targets this particular appendage to the activities of the illegal drug trade. Today, we must consider whether congress intended the Paraphernalia Act to extend so far as to cover the manufacture and sale of containers and other packages used to hold illegal drugs.

Significantly for this appeal, and as will be discussed later in this opinion, congress repealed the Paraphernalia Act in November 1990. It then incorporated those sections that had previously been designated as the Paraphernalia Act into the Controlled Substances Act. *See* Crime Control Act of 1990 § 2401(b). Because Hong–Liang Lin engaged in the conduct for which he was indicted *before* this congressional action, we need only decide whether the small plastic containers, or "crack vials", manufactured by him were prohibited by the pre-November 1990 version of the act. We conclude that in August 1990, when the government indicted him, the Paraphernalia Act did not criminalize the manufacture or sale of the plastic vials Lin produced, and because the judiciary cannot make criminal what congress failed to proscribe, we reverse and remand with a direction to dismiss the indictment.

Lin appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York, Reena Raggi, *Judge*, after a jury trial, in which he was convicted of violating the Paraphernalia Act. *See* 21 U.S.C. § 857(a)(1) (1988). On appeal Lin claims, primarily, that crack vials and other plastic containers were not within the scope of the Paraphernalia Act's then prohibitions. Lin also argues that the act is unconstitutionally vague, but, because we reverse Lin's conviction on nonconstitutional grounds, we need not reach the constitutional issue. *See United States v. Leon,* 766 F.2d 77, 78 (2d Cir.1985) ("a court should not reach constitutional issues when there are other, nonconstitutional grounds upon which it can resolve the case").

We note that, shortly after oral argument in this case, the United States District Court for the Southern District of New York, Robert W. Sweet, *Judge*, found the Mail Order Drug Paraphernalia Control Act to be void for vagueness in a ruling currently on appeal to this court. *See United States v. Schneiderman,* 777 F.Supp. 258 (S.D.N.Y.1991), *appeal docketed,* No. 91–1695 (2d Cir. Dec. 5, 1991).

## BACKGROUND

An immigrant from China, Lin arrived in the United States in 1986. He decided to go into plastics. From 1988 until his arrest, Lin was affiliated with three different companies that specialized in the manufacture of plastic objects. In 1990, he joined his third plastics company, the H.W.D.L.C. Corporation.

At H.W.D.L.C., Lin obtained manufacturing equipment that included, *inter alia*, a plastic injection molding machine. This device produces a wide range of plastic objects by melting solid plastic into a malleable liquid that is injected into a metal mold and then resolidified to produce the desired object. Lin's use of the interstate mails to purchase this and other machines from companies outside of New York State, as well as his successful efforts to secure a lease through the mails for a building to house H.W.D.L.C., formed the basis for this indictment and conviction for a scheme to sell drug paraphernalia.

The salesman who instructed Lin in the use of the manufacturing equipment testified that he thought Lin used the machines to produce "medical products". The government, however, believed otherwise. Suspecting that H.W.D.L.C. produced vials designed to hold the cocaine derivative known as crack, several United States Customs Service agents, armed with search warrants, raided the premises at 203D Fehr Way and 216B Fehr Way in Brentwood, Long Island in July 1990. At these loca-

tions, a government agent testified at trial, they found, among other things, several boxes, each filled with thousands of small plastic vials.

The government arrested Lin and obtained a one-count indictment on August 8, 1990, charging that he had violated the Paraphernalia Act, which makes it unlawful for any person

(1) to make use of the services of the Postal Service or other interstate conveyance as part of a scheme to sell drug paraphernalia;

(2) to offer for sale and transportation in interstate or foreign commerce drug paraphernalia; or

(3) to import or export drug paraphernalia.

21 U.S.C. § 857(a) (1988). On December 6, 1990, the government filed a superseding indictment charging that Lin "knowingly and willfully [made] use of an interstate conveyance as part of a scheme to sell drug paraphernalia." *See* 21 U.S.C. § 857(a)(1) (1988). Although no bill of particulars was requested and no pretrial motions were made, the government at trial particularized its case by arguing that in obtaining the plastic molding machines and the factory lease, and in using them to assist him in the production of crack vials, Lin had used the interstate mails to operate a business that was part of a scheme to sell drug paraphernalia.

After a four day trial, the jury found Lin guilty. Judge Raggi sentenced him to 27 months' imprisonment, followed by 12 months' supervised release, and a special assessment of $50. Since the government is entitled to every favorable inference in our review of the evidence, *see United States v. Gaviria,* 805 F.2d 1108, 1116 (2d Cir.1986), *cert. denied,* 481 U.S. 1031, 107 S.Ct. 1960, 95 L.Ed.2d 531 (1987), for purposes of this appeal we treat the plastic vials manufactured by Lin as "crack vials".

On appeal, Lin principally argues that the act simply did not proscribe the production of his crack vials. For the reasons that follow, we conclude that congress did not intend to include crack vials, or other forms of packaging, in the version of the act under which Lin was indicted and convicted. We therefore reverse the judgment of conviction and direct the court below to dismiss the indictment.

## DISCUSSION

### A. *Coverage of the Act*

In assessing the reach of a criminal statute like the one we are called upon to construe today, we "must pay close heed to language, legislative history, and purpose in order strictly to determine the scope of the conduct the enactment forbids." *Dowling v. United States,* 473 U.S. 207, 213, 105 S.Ct. 3127, 3131, 87 L.Ed.2d 152 (1985). In embarking upon this interpretive venture, we note that the Supreme Court has preferred a strict construction of penal laws in deference to congress's sole authority to define federal crimes and to enact statutes prohibiting such conduct. *Id.*

#### 1. Statutory Language

We first consider the language of the act itself. *Hughey v. United States,* 495 U.S. 411, 415, 110 S.Ct. 1979, 1982, 109 L.Ed.2d 408 (1990); *see also United States v. Yip,* 930 F.2d 142, 147 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 197, 116 L.Ed.2d 157 (1991).

To be sure, defining drug paraphernalia is not easy. There are many everyday products, such as pipes, razor blades, mirrors, and spoons, that, in the hands of a drug user, can be used to facilitate the processing and consumption of controlled substances. Developing a list of devices to be classified as drug paraphernalia, without intruding into the regulation of innocent products and activities, is a task that severely challenges any lawmaker. *See generally Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (upholding village ordinance providing for licensing of drug paraphernalia).

Addressing this problem in the Paraphernalia Act, congress combined an expansive general definition of paraphernalia with a list of illustrative products that are prohib-

ited. The clause entitled " 'Drug paraphernalia' defined" described drug paraphernalia as

> any equipment, product, or material of any kind which is primarily intended or designed for use in manufacturing, compounding, converting, concealing, producing, processing, preparing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance, possession of which is unlawful under the Controlled Substances Act * * *. It includes items primarily intended or designed for use in ingesting, inhaling, or otherwise introducing marijuana, cocaine, hashish, hashish oil, PCP, or amphetamines into the human body * * *.

21 U.S.C. § 857(d) (1988).

However, this broad definition does not readily reach Lin's crack vials. The common meanings of the gerunds used in this clause—"manufacturing", "compounding", "converting", "concealing", "producing", "processing", "preparing", "injecting", "ingesting", "inhaling", and "introducing"—do not suggest items designed to *contain* or *package* illegal drugs. Even the inclusion of products intended to "conceal[ ]" illegal drugs is not relevant where, as here, the clear plastic vials manufactured by Lin do not "conceal", that is, "prevent disclosure or recognition". *Webster's New International Dictionary* 469 (3d ed. 1971).

Moreover, the legislative history indicates that, in targeting products "primarily intended or designed for use in * * * concealing * * * a controlled substance", 21 U.S.C. § 857(d), the discourse focused on products that could hide the drug user's actual ingestion of illegal narcotics—devices that include replicas of legal products, such as Dristan nasal sprays, which permit a user to ingest cocaine in front of others without fear of detection. *See Mail Order Drug Paraphernalia Control Act: Hearing Before the Subcomm. on Crime of the House Comm. on the Judiciary,* 99th Cong., 2d Sess. 103 (1986) [*Hearing*] (statement of Joyce Nalepka, national president, National Federation of Parents for Drug Free Youth). Consequently, we do not consider the clear plastic vials at issue here to be a "concealing" product for purposes of the act, but we emphasize that our holding that the Paraphernalia Act does not proscribe Lin's crack vials and other packages does not address those situations in which the government could reasonably argue that a manufactured package was designed or intended primarily for "concealing" narcotics.

The statute's general definitional clause is followed by a list intended to illustrate certain drug paraphernalia products used in connection with the consumption of illegal drugs:

> (1) metal, wooden, acrylic, glass, stone, plastic, or ceramic pipes with or without screens, permanent screens, hashish heads, or punctured metal bowls;
>
> (2) water pipes;
>
> (3) carburetion tubes and devices;
>
> (4) smoking and carburetion masks;
>
> (5) roach clips: meaning objects used to hold burning material, such as a marihuana cigarette, that has become too small or too short to be held in the hand;
>
> (6) miniature spoons with level capacities of one-tenth cubic centimeter or less;
>
> (7) chamber pipes;
>
> (8) carburetor pipes;
>
> (9) electric pipes;
>
> (10) air-driven pipes;
>
> (11) chillums;
>
> (12) bongs;
>
> (13) ice pipes or chillers;
>
> (14) wired cigarette papers; or
>
> (15) cocaine freebase kits.

21 U.S.C. § 857(d) (1988).

As is evident, this extensive list of drug paraphernalia does not mention crack vials or, for that matter, any other container used for the storage of illegal drugs. While this subclause sets forth merely examples of paraphernalia, and may not include several kinds of paraphernalia otherwise covered by the gerunds set forth in the general definitional section, the ab-

sence of any containers from this list significantly undercuts the government's contention that the statute plainly includes plastic vials within its scope.

The government's reliance on *United States v. Main Street Distributing Inc.*, 700 F.Supp. 655 (E.D.N.Y.1988), also decided by Judge Raggi, to support its argument that the broadly-worded statute prohibits containers and packages, is misplaced. The observation in *Main Street* that "the statute seems [on its face] aimed at any paraphernalia intended for use in the chain of drug trafficking, from initial manufacture to ultimate ingestion", *id.* at 661, must be read in the context of the issue which that court was analyzing, namely, whether the investigative agents, by listing plastic bags as proscribed items under the act, provided false information to a magistrate in their application for a search warrant. Because "the ultimate responsibility [rests] on the judicial officer for interpretation of the law applicable to any warrant", *id.*, the *Main Street* court was concerned with whether the investigating agents had misled the magistrate by not fully apprising the judicial officer as to the nuances of the act. While the court determined that the magistrate did not err in treating the defendant's purchase of small plastic bags as part of its determination of whether probable cause existed, it does not follow that the statute itself treats such containers as drug paraphernalia.

The government also argues that "manufacturing * * * a controlled substance" includes within its definition the manufacture of packages or containers for storing illegal narcotics like crack. As defined in the dictionary, to manufacture is "to make (as raw material) into a product suitable for use". *Webster's New International Dictionary* 1378 (3d ed. 1971). While packaging certainly can be an element in some manufacturing processes, congress's listing of some aspects of that process, such as compounding and converting, while omitting others, such as packaging and containing, leads us to conclude that congress did not intend the phrase "manufacturing

* * * a controlled substance" to include the manufacture of packages or containers.

The cornerstone of the government's argument, however, relies less upon the dictionary and more on the general definitional section for narcotics crimes. *See* 21 U.S.C. § 802(15) (1988). That section was originally enacted in 1970 as part of the statute known as the Controlled Substances Act. *See* Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No. 91–513, § 102(14), 84 Stat. 1236 (1970). It defines the term "manufacture" broadly, referring to it as

the production, preparation, propagation, compounding, or processing of a drug or other substance, either directly or indirectly or by extraction from substances of natural origin, or independently by means of chemical synthesis or by a combination of extraction and chemical synthesis, and includes any *packaging or repackaging of such substance* or labeling or relabeling of its container * * *.

21 U.S.C. § 802(15) (1988) (emphasis added).

The government notes that this definition appears in the same subchapter of the United States Code as the Paraphernalia Act and argues that, because it is the general definitional section for narcotics crimes, it should control, and therefore define, the Paraphernalia Act's use of the word, "manufacturing".

We assume, without deciding, that by placing the Paraphernalia Act in Chapter 13 of Title 21 as § 857 thereof, congress intended to apply the definition of "manufacture" at § 802(15) to the provisions of the Paraphernalia Act. We assume this notwithstanding the fact that congress later repealed the Paraphernalia Act in its entirety and reenacted it as part of the Controlled Substances Act. *See* Crime Control Act of 1990 § 2401. We reject, however, the government's interpretation of the definition of "manufacture" contained in § 802(15).

That subsection defines the activity of manufacturing, not the product whose manufacture is interdicted. The government would have us read the phrase "in-

cludes any packaging or repackaging of such substance or labeling or relabeling of its container * * * " as expanding the earlier term "drug". But as with the definition of drug paraphernalia discussed above, the terms "packaging", "repackaging", "labeling", and "relabeling" are gerunds that denote activities rather than products. As used in this subsection, they expand the concepts of "production, preparation, propagation, compounding [and] processing" used earlier in the definition. In our view, the definition of "manufacture" in § 802(15) means simply that the activities referred to—the placement of the drugs into packages—are to be deemed part of the manufacturing process. Thus, we reject the government's reliance on § 802(15) as describing the products of this case—crack vials—and we hold that the language of the statute under which Lin was indicted does not proscribe the manufacture or sale of Lin's crack vials or, for that matter, any other packages that merely serve to contain illegal narcotics.

2. Legislative History

The general legislative history of the Paraphernalia Act strongly supports our conclusion that the statutory language did not include crack vials, or other packages, within its prohibitions. Of particular significance is the statute's striking similarity to, and even more importantly, its differences from the Model Drug Paraphernalia Act ("Model Act"), which was drafted by the Drug Enforcement Administration in 1979.

Congressman Mel Levine, the sponsor of the act in the House of Representatives, noted that the act was "drafted closely after the model Drug Paraphernalia Act [*See* Drug Enforcement Administration, *Model Drug Paraphernalia Act* (August 1979), *reprinted in Hearing* at 178–93] [and] deliberately incorporate[d] much of the same language that is contained in that act." *Hearing* at 15. While some have observed that the Model Act and the Paraphernalia Act differ in some extremely significant ways, *see, e.g., United States v. Schneiderman*, 777 F.Supp. 258, 265 (S.D.N.Y.1991) (act omits Model Act's

scienter standard), in the definitional sections which form the core of this appeal, the act's language closely tracks that of the Model Act. Comparing the two acts, particularly their differences, virtually compels the conclusion that congress intended to exclude crack vials and containers from its reach.

The Model Act, for example, defines paraphernalia as

all equipment, products and materials of any kind which are used, intended for use, or designed for use, in *planting, propagating, cultivating, growing, harvesting,* manufacturing, compounding, converting, producing, processing, preparing, *testing, analyzing, packaging, repackaging, storing, containing,* concealing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance in violation of this Act * * *.

*Hearing* at 181 (emphasis added). The congressional version adopted this definitional section, *see supra* at 253–54, but omitted eleven words from its general description of drug paraphernalia: "planting", "propagating", "cultivating", "growing", "harvesting", "testing", "analyzing", *"packaging", "repackaging", "storing",* and *"containing"*. Given congress's verbatim adoption of the rest of the definitional section, the exclusion of these words—especially the latter four—is particularly significant. It signals an intent to exclude packages and containers from this statute.

Perhaps even more significantly, congress deleted "cocaine vials" from the extensive list of specific examples of drug paraphernalia. The Model Act's paragraph 12 sets forth a list of thirteen examples of drug paraphernalia:

(12) Objects used, intended for use, or designed for use in ingesting, inhaling, or otherwise introducing marihuana, cocaine, hashish, or hashish oil into the human body, such as:

(a) Metal, wooden, acrylic, glass, stone, plastic, or ceramic pipes with or without screens, permanent screens,

hashish heads, or punctured metal bowls;

(b) Water pipes;

(c) Carburetion tubes and devices;

(d) Smoking and carburetion masks;

(e) Roach clips: meaning objects used to hold burning material, such as a marihuana cigarette, that has become too small or too short to be held in the hand;

(f) Miniature cocaine spoons, and *cocaine vials;*

(g) Chamber pipes;

(h) Carburetor pipes;

(i) Electric pipes;

(j) Air-driven pipes;

(k) Chillums;

(*l*) Bongs;

(m) Ice pipes or chillers * * *.

*Hearing* at 182 (emphasis added). Adapting this set of examples for use in the federal statute, congress included every example set forth in the Model Act but one: the "cocaine vials" mentioned in subparagraph (f). Along with the drafter's exclusion of the language relevant to packages and containers from the general definitional section, the omission of "cocaine vials" from the list of specific examples of paraphernalia makes clear that congress, although strongly influenced by the Model Act, decided to enact a narrower statute, one that did not include packages and containers among its proscriptions.

Finally, as the legislative record demonstrates, the act arose mainly from congress's concern with "[p]roducts which make drug use easier, prolong, or increase drug highs, or enable the user to avoid detection, [products which] serve only to encourage the illicit use of drugs." *Hearing* at 17 (statement of Congressman Mel Levine). At the principal hearing on the legislation, there simply was no discussion of containers, or of packages, or of whether they were covered under the act. Such a glaring absence of discussion regarding containers such as crack vials, coupled with no other evidence of congressional intent to treat them so, also suggests that congress

did not consider these items to be among the paraphernalia it was prohibiting.

In sum, we find nothing in the legislative history to indicate that congress intended to include packages of any kind, particularly crack vials, within the scope of the Paraphernalia Act as enacted in 1986.

3. Policy

We turn, finally, to the overall policy of the statute which, the government argues, independently compels a conclusion that crack vials and other packages must be covered by the act. The government urges us to consider that the purpose of the act was to bolster state enforcement in curbing the sale of drug paraphernalia, and that "[i]t follows that Congress did not intend to exclude from its bolstering effort a large area—the packaging material included in the states' [i.e., the Model Act's] definition of drug paraphernalia." In effect, . the government urges us, as a matter of policy, to extend the reach of the now-repealed Paraphernalia Act to include crack vials, despite congress's transparent deletion of them from that version of the statute.

We cannot do this. The government is asking us to improve upon congress's work. While we agree with the government that by reading "crack vials" into the statute we would most likely assist in bringing to justice manufacturers and peddlers who flout our currently severe restrictions on the sale and possession of illegal drugs, and while such a policy choice might add a small increment of effectiveness to the "war on drugs", such a policy decision was, and is, "for Congress and not this Court to effectuate." *United States v. Gaggi*, 811 F.2d 47, 58 (2d Cir.), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987).

In short, none of the sources analyzed above—neither the language of the statute, the legislative history, nor the general congressional policy—permits us to retroactively inject crack vials, or any other containers, into the prohibitions of the Paraphernalia Act, repealed on November 29, 1990.

Moreover, even were there some ambiguity as to congress's intent over Lin's crack vials, the rule of lenity would impel us to reverse. As the Supreme Court recently noted in determining the amount of restitution required under the Victim Witness Protection Act, "longstanding principles of lenity, which demand resolution of ambiguities in criminal statutes in favor of [defendants] preclude our resolution of [an] ambiguity against petitioner on the basis of general declarations of policy in the statute and legislative history." *Hughey*, 495 U.S. at 422, 110 S.Ct. at 1985 (citation omitted).

### B. Other Issues

In addition to his assertion that the act does not encompass packaging materials like the crack vials at issue here, Lin sets forth one other statutory argument, grounded in his indictment for making use of an interstate conveyance "as part of a scheme to sell drug paraphernalia." Specifically, Lin argues that congress intended to ban only the *sale*, not the *manufacture*, of drug paraphernalia, and that since he did not sell or offer to sell paraphernalia in interstate commerce, the act does not apply to him.

Because we already have determined that the products manufactured by Lin do not constitute paraphernalia for purposes of the act, *see Section A, supra*, we do not reach this issue. Moreover, because we reverse on nonconstitutional grounds, we decline to address Lin's claim that the act is unconstitutionally vague.

### CONCLUSION

A court may not punish activities that congress fails to criminalize by statute. Since congress in enacting the Paraphernalia Act deliberately omitted "packaging", "containing", and "cocaine vials" from its definition of drug paraphernalia, we conclude that the plastic containers produced by Lin were not "drug paraphernalia" as defined by the act. It follows that Lin's purchase of machines to manufacture crack vials and his leasing of buildings to house that activity were not criminal acts. We therefore reverse the judgment of conviction and remand to the district court with a direction to dismiss the indictment.

The mandate shall issue forthwith.