UNITED STATES of America,

v.

BIG APPLE BAG COMPANY, INC., Huan Kung Teng, also known as "Danny Teng," and "Wei Kang Teng," also known as "Richard Teng," Defendants.

No. 03–CR–781 (NGG).

United States District Court, E.D. New York.

Feb. 25, 2004.

Richard Ware Levitt, Law Offices of Richard Ware Levitt, Gary Becker, Law Offices of Gerald B. Lefcourt, New York, NY, for Defendants.

Carrie Capwell, United States Attorney's Office, Brooklyn, NY, for Plaintiff.

## MEMORANDUM & ORDER

GARAUFIS, District Judge.

**Introduction**

This case was commenced by the government with a multi-count indictment against the above-captioned defendants charging them with, among other things, trafficking in drug paraphernalia in violation of 21 U.S.C. § 863 and of conspiracy to do the same. Now before the court is the defendants' motion to suppress evidence seized from the defendants' warehouse on May 7, 2003 pursuant to a warrant issued one day before. The motion argues both that the affidavit by which the warrant was obtained contained deliberate or reckless material falsehoods and that material information in the same affidavit was obtained by an illegal search.

**Background**

In *Franks v. Delaware*, 438 U.S. 154, 165, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that when a Magistrate Judge issues a warrant after making a determination of probable cause, "it would be an unthinkable imposition on [her] authority if a warrant affidavit, revealed after the fact to contain a deliberately or reckless false statement, were to stand beyond impeachment." In this case the defendants have argued that the affidavit by which the government obtained a search warrant that enabled it to seize a vast amount of physical evidence from the defendants contained such a deliberate or reckless false statement. After finding that the defendants had made allegations sufficient to require a hearing on the subject I held a *Franks* hearing on February 24, 2004. And after hearing the testimony at that proceeding I conclude that the affidavit by which the government obtained this evidence contained material statements that were, at the very least, recklessly false; further, I conclude that had these false statements been expunged from the affidavit presented to Magistrate Judge Go probable cause would not have existed to issue a search warrant. The evidence seized pursuant to this warrant, therefore, must be suppressed and barred from the defendants' trial.

At the February 24 hearing the court received a great deal of testimony from Neil Donovan, James Scartozzi, and Elvin Quinones, FBI special agents who were present at the warehouse on May 6, 2003, the day Danny and Richard Teng were arrested inside the warehouse. The facts elicited through their testimony are so numerous that in this Memorandum & Order I will only refer to those facts I find immediately relevant and probative. Agent Quinones was the case agent for the May 6 operation, and he signed the affida-

vit that day by which a warrant was obtained from Magistrate Judge Marilyn D. Go. Agents Scartozzi and Donovan were among the six to eight other law enforcement officers who accompanied Quinones to the defendants' warehouse in College Point, Queens, on May 6, 2003. Also present were other FBI agents, New York City Police Detectives, and Deputy U.S. Marshals. Upon receiving information from a confidential informant, Agent Quinones had observed the warehouse the day before, by himself. On May 5 Quinones positively identified Danny Teng from a photograph as a fugitive who had violated his probation. Quinones did not, however, arrest Danny Teng that day because Quinones was alone and it was not proper practice to effect such an arrest without other agents present, if possible. This decision to return the next day with assistance is understandable.

On May 6 the group of law enforcement officers met the man they believed from Quinones' prior surveillance and the photograph to be Danny Teng outside the warehouse, but he claimed he was not Danny Teng. The man said Danny Teng was inside the warehouse, and the man either offered or was demanded to take the officers inside the warehouse to find Danny Teng. Inside the warehouse some of the officers performed a brief protective sweep of the warehouse while others determined, within a few minutes at most, that the man whom they met outside the warehouse was in fact Danny Teng. While inside the warehouse the agents encountered Danny Teng's son, Richard Teng, whom they quickly determined to be the only other person in the warehouse. The officers arrested Danny Teng, and he was immediately removed from the premises by the U.S. Marshals.

While inside the warehouse, as they effected the arrest and performed their protective security sweep, the law enforcement officers saw in plain view thousands of cardboard boxes, some of which were open or overflowing. In the open or overflowing boxes the officers also saw large amounts of glassine baggies of the type used to package for retail sale such drugs as heroin, cocaine, and marijuana, some with logos on them; the officers also saw glass and plastic vials and jars, closed on one end and often used for holding various illegal drugs, as well as paper sleeves often used for holding heroin. Upon seeing these items the agents believed that they had come upon large quantities of contraband drug paraphernalia. They therefore contacted the U.S. Attorney's Office for the Eastern District of New York to determine if they had probable cause to arrest Richard Teng. After some time it was determined that the agents should arrest Richard Teng, and he was also arrested and taken away. Before Richard Teng was arrested, and before Agent Quinones left the warehouse, a telephone caller who was a lawyer for some or all of the defendants called the office and instructed the officers not to conduct any search of the warehouse unless they had obtained a warrant.

The officers attempted to obtain such a warrant though Agent Quinones, who went to the U.S. Attorney's Office for the Eastern District and met with AUSA Carrie Capwell in her office so they could together draft an affidavit for his signature. During the course of that meeting Quinones communicated with Agent Donovan, who was continuing to secure the warehouse, at least three separate times by telephone. Among the subjects of those conversations were discussions of what the different agents had seen inside the warehouse. After all of these discussions Capwell drafted an affidavit for Quinones' signature, which he reviewed and signed under oath. The affidavit began by stating that there was probable cause to believe that drug paraphernalia and business

records relating to the importation and sale of drug paraphernalia, in violation of 21 U.S.C. § 863, were located at the warehouse. The affidavit further stated, in part:

8. While inside the warehouse I observed in plain view massive amounts of contraband drug paraphernalia. This includes: (1) thousands of different colored glassine baggies, which based on my training and experience are typically used to package quantities of heroin, cocaine, or marijuana in nickel and dime bags for retail; (2) thousands of glass vials of different sizes, which based on my training and experience are used to package quantities of drugs for retail and are also used as crack pipe stems; (3) thousands of small jars with different colored caps, which based on my training and experience are used to package rocks of crack cocaine and crystal methamphetamine for retail; (4) thousands of paper sleeves, which based on my training and experience are used to package quantities of heron for retail; (5) hundreds of glass crack pipes, which based on my training and experience are used for inhaling crack cocaine; and (6) thousands of "bullets," which I have learned, are mechanical devices which function to dispense powder cocaine in pre-measured quantities used for inhaling. The above items were scattered throughout the premises in open boxes and on top of boxes, among other locations.

Magistrate Judge Go issued the warrant, and the government seized a great deal of evidence the next day.

The government, however, later realized that it faced two problems. First, contrary to the mistaken belief of both the agents and Ms. Capwell, the Second Circuit has determined that trafficking in items that are used merely to package or contain drugs does not violate 21 U.S.C. § 863. Although this conclusion might fairly be deduced from the plain language of the statute, it has explicitly been the law in the Second Circuit for over a decade. See United States v. Lin, 962 F.2d 251 (2d Cir.1992). Second, contrary to Quinones' sworn statement, there were not "thousands" of "bullets" (a term for a device used to measure and ingest powdered cocaine, not the kind used as ammunition in a firearm) at the warehouse; rather, upon completing an inventory of all the boxes seized after the execution of the warrant the government could find only three such bullets. These errors posed a problem for the government, because other than the bullets and the crack pipes, the items listed in the affidavit were all containers not proscribed by the statute.

Still, when the defendants initially moved to suppress the fruits of this seizure, this court denied the motion. In my Memorandum and Order of February 13, 2004 I ruled that regardless of any incorrect statements contained in the affidavit, the fact that Quinones observed crack pipes, which are undisputedly contraband under the statute, was by itself sufficient to create probable cause. On the eve of trial, however, the defendants received and brought to my attention certain 3500 material, to wit, a 302 report prepared by Special Agent Scartozzi that failed to mention specifically observing any crack pipes at the warehouse. The combined effect of the 302 report and the fact that, as the government had previously conceded, Quinones' erroneous statement in his affidavit that he had observed "thousands" of "bullets" was to convince me that a Franks hearing was required on the issue of whether Agent Quinones' statement in the affidavit concerning crack pipes he had observed was true, or whether it was deliberately or recklessly false.

**Agent Quinones' Testimony and Material False Statements in his Affidavit**

■ Agent Quinones was not a credible witness. His answers were frequently

vague or evasive, his memory was poor, and his testimony was often inconsistent with the testimony of the other two agents in crucial respects. For example, the following statements are all suspect: Quinones' statement that the protective sweep of the approximately 7,000 square foot warehouse by several law enforcement officers lasted about twenty minutes was at odds with both common sense and the other agents' testimony; his statement that despite the fact that he had information from an informant that Danny Teng dealt in drug paraphernalia, he had no suspicion that there was any drug paraphernalia inside the warehouse before he entered it; his statement that he waited at the warehouse about three hours to learn whether Richard Teng should be arrested, even though the other agents said it was half an hour or 90 minutes at most; his statement that even though he had positively identified the man outside the warehouse the day before as Danny Teng from a photograph, he truly doubted that the man he stopped outside the warehouse on May 6 was in fact Danny Teng (a fugitive from justice), merely because the man denied that he was Danny Teng; Quinones' inability to explain the difference between a crack vial and a crack pipe, when he has done over a hundred narcotics investigations for the FBI during his seventeen year career; his sworn statement in the affidavit that there was probable cause to believe that the defendants had violated 21 U.S.C. § 863 when in fact he had never read the statute and did not know what items were proscribed by it; his admission that he never "personally" saw more than one or two "bullets" at the warehouse, when in fact he swore to the Magistrate that he saw thousands of them; and, perhaps worst of all, his statement that Agent Donovan told him on the phone that he, Agent Donovan, had seen "thousands" of bullets at the warehouse. Agent Donovan testified that during one of their phone conversations (while Quinones was assisting Capwell in preparing his affidavit) he explained to Quinones what a bullet is and that he had seen a couple of them. Donovan specifically denied that he ever told Quinones that he saw thousands of "bullets" in the warehouse, and I find that his recitation of these conversations was credible while Quinones' was not. Placing the most charitable construction on Quinones' testimony, I believe that what actually happened was that because Quinones had seen such large quantities of baggies, vials, and other containers, he simply assumed that if he or Donovan had seen a couple of "bullets", it logically followed that there were thousands of "bullets," whether or not he or anyone else had seen such quantities.

Because I find Agent Quinones not credible, I also find that he recklessly, if not deliberately, disregarded the truth in his statement concerning the crack pipes he swore he observed in the affidavit. I do not believe that he personally actually saw any crack pipes in the warehouse. As to the "bullets," it is conceded that he did not see "thousands" of them; as his sworn statement about the "bullets" was so grossly false and his testimony about the "bullets" was so confused, I cannot conclude that Quinones understood what a "bullet" is, or that he personally observed any "bullets" at the warehouse.

## An Illegal Warrantless Search of Warehouse

■ Concerning the crack pipes, however, even if Quinones actually had seen such crack pipes at the warehouse, I find that he only did so pursuant to an illegal, warrantless search of the warehouse. In particular, based on the credible testimony of all the agents, I find that Quinones did not properly see any crack pipes in plain view because Quinones did not actually see the crack pipes until at least half an hour after he entered the warehouse—after any pro-

tective sweep (in which Quinones himself admittedly did not even participate) was over, and after Danny Teng had been arrested and removed from the warehouse. At that point the only purpose for Quinones' presence in the warehouse was to wait with Richard Teng while a determination was made by the U.S. Attorney's office whether Richard Teng should be arrested. This purpose neither required nor permitted Quinones to wander through the warehouse, to "see what I could see," (as he admitted at the hearing) even if he was looking at things outside of boxes (the crack pipes were apparently on a table some distance from where Teng was standing). There was no testimony that Quinones had received permission from either of the defendants to conduct any search, and in fact at some point he became aware that an attorney for the defendants was specifically instructing him not to conduct any search without a warrant. It is well-settled that the government may not use the fruits of an illegal search in order to obtain a warrant to search those same premises, and as I find that if Agent Quinones did see any crack pipes such observation was the result of an illegal search, that element of the affidavit cannot provide probable cause to issue a search warrant. Nor does the fact that Agent Scartozzi may have seen crack pipes in plain view as he conducted his security sweep change this analysis—Scartozzi did not sign the affidavit, Quinones swore that he had observed the crack pipes himself, and there was insufficient evidence that Scartozzi ever informed Quinones about the crack pipes or ever showed them to him.

**No Probable Cause without the "Bullets" or Crack Pipes**

■ Without the information concerning the crack pipes or the bullets, the remaining parts of the affidavit did not constitute probable cause. The government argued at the hearing that even without the "bullets" or the crack pipes, the massive quantities of containers typically used to package retail amounts of drugs, some with printed images of marijuana leaves or other drug-related logos on them, as well as other non-contraband drug-related items such as a catalog from which one could order drug paraphernalia, by themselves constitute probable cause to believe that the defendants were dealing in contraband drug paraphernalia. *Cf. United States v. Main Street Distributing, Inc.,* 700 F.Supp. 655, 659 (E.D.N.Y.1988)(holding that even though containers were not contraband [under an earlier drug paraphernalia statute], a "totality of the circumstances" test for determining probable cause could include consideration of such containers). The government offered the example of where an officer legally observed in a room a scale, some baking soda, and large amounts of cash (none of those items themselves contraband), the presence of all three together could create probable cause to believe that narcotics-related activity had taken place in the room.

This example misses the mark—the difference between that situation and the instant case is that there are few kinds of activity, other than illegal narcotics activity, that make use of a scale, baking soda, and large amounts of cash simultaneously. It is entirely plausible in an alleged drug paraphernalia case, on the other hand, that a person could be in the business of buying and selling large volumes of these types of containers (containers that are not contraband even if they have images of marijuana leaves printed on them), without violating 21 U.S.C. § 863. There has been no expert testimony that the percentage of people who operate such a "drug container" business also deal in proscribed drug material is so high that the mere presence of high volume amounts of such containers constitutes probable cause to believe that

contraband is also present. Moreover, the presence of a catalog from which one could order drug paraphernalia proscribed by the statute does not change this analysis, because the catalog offered both proscribed items as well as non-proscribed containers.

## Conclusion

Congress, according to the Second Circuit, has determined not to proscribe containers in which illegal narcotics are bought and sold. And the authors of the Fourth Amendment to our Constitution, according to the Supreme Court, have determined that evidence obtained by way of a warrant that was itself obtained through government agents' statements that were deliberately falsely made, or made in reckless disregard of the truth, may not be introduced against a criminal defendant. As a result, after hearing the testimony of Agent Quinones and others and examining the affidavit he submitted to Magistrate Judge Go, I order that all evidence the government seized pursuant to the warrant issued by Magistrate Judge Go on May 6, 2003 must be excluded from the government's case against the defendants.

SO ORDERED.